[Cite as *In re C.W.*, 2020-Ohio-1248.]

IN THE COURT OF APPEALS OF OHIO

TENNTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In re: C.W., minor child, | : | |
| | | No. 19AP-309 |
| (B.W., | : | (C.P.C. No. 15JU-12864) |
| Appellant). | : | (REGULAR CALENDAR) |

---

D E C I S I O N

Rendered on March 31, 2020

---

**On brief:** *Yeura Venters*, Public Defender, and *George M. Schumann*, for appellant.

**On brief:** *Robert J. McClaren*, for appellee Franklin County Children Services.

---

APPEAL from the Franklin County Court of Common Pleas,
Division of Domestic Relations, Juvenile Branch.

KLATT, J.

{¶ 1} Appellant, B.W., appeals from a judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, which terminated her parental rights and granted permanent custody of her minor child, C.W., to Franklin County Children Services ("FCCS"). For the following reasons, we affirm.

{¶ 2} On August 3, 2015, FCCS filed a complaint alleging that C.W., born March 26, 2012, was a neglected and dependent child pursuant to R.C. 2151.03(A)(2) and 2151.04(C), respectively. Specifically, the complaint alleged that on August 1, 2015, appellant left three-year-old C.W. at home unsupervised for approximately one and one-half hours while appellant was at work; marijuana paraphernalia was discovered in the home. FCCS took emergency custody of C.W. and obtained temporary custody on August 4, 2015. The

complaint was dismissed after ninety days because service on the putative father had not been perfected.[1]

{¶ 3}   On October 21, 2015, FCCS refiled the complaint.  The trial court continued the temporary orders and appointed a guardian ad litem ("GAL") for C.W.[2]

{¶ 4}   A reunification case plan was filed on December 3, 2015.  The case plan indicated that appellant was sexually abused by her biological father and physically abused while she was in foster care.  The case plan further noted that appellant was bonded to C.W. and desired that C.W. be returned to her care as soon as possible.  In addition, the case plan indicated that appellant was currently seeking employment, had her own housing, and paid her bills without difficulty.  The case plan also noted that appellant had anger management issues and used marijuana to cope with stress.

{¶ 5}   Pursuant to the case plan, appellant was required to sign all requested releases allowing FCCS team members to obtain information with linked/referred community programs or service providers, comply with random drug screens through American Court Services ("ACS"), complete a mental health assessment and follow all recommendations, complete a parenting mentor program through Ohio Guidestone ("Guidestone"), complete an alcohol and drug assessment ("AOD") and follow all recommendations, apply for benefits through Ohio Job and Family Services, refrain from using marijuana or any other illegal substances, and obtain employment.

{¶ 6}   Following a hearing on December 2, 2015, the trial court issued a decision on December 3, 2015, finding C.W. to be a dependent child pursuant to R.C. 2151.04(C) and dismissing the neglect cause of action.  The court made C.W. a ward of the court, committed her to the temporary custody of FCCS pursuant to R.C. 2151.353(A)(2), and approved and adopted the case plan.

---

[1] Through DNA analysis, the putative father was excluded as C.W.'s biological father.  At a hearing on June 26, 2017, appellant named Anthony Fuller as a possible biological father of C.W. Publication service on Fuller was perfected on February 12, 2018.

[2] In April 2016, C.W.'s original GAL withdrew and a new GAL was appointed. In June 2017, the substitute GAL withdrew due to a conflict with C.W.'s wishes to be reunified with appellant; the trial court appointed that GAL to act as C.W.'s attorney.  In July 2017, another GAL was appointed for C.W. In July 2018, C.W.'s attorney withdrew; a substitute attorney was appointed in October 2018.

{¶ 7} On December 21, 2016, FCCS filed a motion seeking permanent custody of C.W. Trial was conducted on May 21, 2018, July 23, 2018, and February 25, 2019. In addition, the trial court held several non-evidentiary hearings in the matter.

{¶ 8} At trial, appellant testified in FCCS's case, as if on cross-examination, that she left C.W. unsupervised at home on August 1, 2015 because she had to be at work before C.W.'s babysitter arrived. Appellant asserted that she had completed parenting classes, obtained stable housing and employment, and participated in drug and alcohol treatment pursuant to an assessment/recommendation provided by Guidestone. Appellant admitted she had consistently used marijuana since the age of 18; however, she had never done so in C.W.'s presence. She further averred she had not used marijuana in the past one and one-half months.

{¶ 9} Appellant acknowledged that her case plan objective requiring her to submit to random drug screens included an admonition that failing to complete a screen would be considered a positive screen. She admitted inconsistencies in completing the required screens, attributing them to transportation and/or employment issues; however, she candidly admitted that she sometimes "just didn't go." (May 21, 2018 Tr. at 23.)

{¶ 10} Appellant asserted that she requested mental health counseling because she was going to have difficulty coping with losing C.W. to the temporary custody of FCCS. She attended weekly counseling sessions and was prescribed Paxil; however, she did not think the medication was helpful, so she stopped taking it. She acknowledged she had previously participated in mental health counseling while appellant herself was in foster care.

{¶ 11} According to appellant, she had been in her current residence for one and one-half years. She was evicted from her previous residence because she fell behind on her rent after serving two separate jail terms. She was currently employed as a machine operator and had been sporadically employed in other manufacturing positions. Since August 2015, her longest continuous period of employment was one and one-half years.

{¶ 12} Appellant acknowledged past difficulties with anger management; however, through completion of an anger management program at Guidestone in November 2016, she learned coping mechanisms to curtail her anger issues. She admitted she had been convicted of arson in April 2016 arising from a domestic violence incident with her then-boyfriend which resulted in her setting the man's clothing on fire in the backseat of a car,

and convicted of criminal mischief in November 2016 arising from a physical altercation with a family member. She conceded that the latter incident occurred after she had completed the anger management program. She further admitted having one "angry outburst" during a meeting with FCCS; however, she could not recall the impetus for her behavior. *Id.* at 40.

{¶ 13} Since C.W. was removed from her care in August 2015, appellant missed only three visits with her. The visitation initially occurred at FCCS; however, appellant was eventually permitted home visits with C.W. Appellant admitted, however, that because she "got upset and I didn't use self-control in front of my child" during one of the home visits, visitation resumed at FCCS. *Id.* at 41. Appellant testified she had a "strong" and "unbreakable" bond with C.W. and had improved her parenting skills since August 2015. *Id.* at 45.

{¶ 14} Jamie Robinson, appellant's FCCS caseworker, testified that she referred appellant to ACS to complete random drug screens. She advised appellant that missed screens would count as positive screens, and that positive screens would negatively impact her case. FCCS provided transportation assistance to appellant to the drug screen location. According to Robinson, ACS records indicated that since August 28, 2015, appellant had 37 negative screens, 62 positive screens, and 87 missed screens. The vast majority of the positive screens were for marijuana.

{¶ 15} Robinson averred that appellant completed a mental health assessment with Guidestone and a psychological evaluation with Netcare Access. She also completed an anger management program; however, since completion of that program, appellant had physical altercations with relatives and displayed inappropriate anger during FCCS appointments.

{¶ 16} Robinson further testified that although appellant attended parenting classes as required by the case plan, she did not complete them. She opined that appellant continued to exhibit inappropriate judgment regarding parenting C.W., such as the use of marijuana in her home and permitting C.W. access to her cell phone which contained inappropriate sexual images of appellant.

{¶ 17} Robinson also averred that appellant completed a drug and alcohol assessment with Guidestone in November 2015. Although no recommendations were

made at the time, after appellant had several positive drug screens, alcohol and drug treatment services were added in November 2016. After FCCS filed the permanent custody motion, appellant voluntarily participated in Franklin County Family Recovery Court ("Recovery Court"), a program aimed at addressing parents who have a history of substance abuse and, as a consequence, have lost or are at risk of losing custody of their children. Appellant was involuntarily discharged from the program in April 2018. Robinson expressed concerns about appellant's sobriety due to her continued positive drug screens.

{¶ 18} Regarding the housing and employment components of appellant's case plan, Robinson testified that appellant had lived in four different places since August 2015–the home from which she was evicted when she was incarcerated, a boarding house, a domestic violence shelter, and her current residence. Since August 2015, appellant has had ten different jobs, most of which were obtained through temporary agencies, sometimes lasting only one or two months.

{¶ 19} Robinson asserted that appellant's visitation with C.W. included various levels of supervision depending upon appellant's progress on the case plan. Since August 2015, appellant cancelled or missed 25 visits. Robinson asserted that appellant "interacts very well" and is "[v]ery comfortable" with C.W., and C.W. is bonded to appellant. (May 21, 2018 Tr. at 87-88, 93.) Appellant's current visitation schedule consists of weekly, one-hour supervised visits at FCCS.

{¶ 20} According to Robinson, FCCS's attempts to place C.W. with relatives have been unsuccessful. C.W.'s current foster placement was made in January 2018 and is the sixth placement since August 2015. During one of the more successful foster placements, C.W. reported to Robinson that appellant told C.W. that if she misbehaved, she would come home to live with her. Thereafter, C.W. began misbehaving, resulting in her removal from that foster home. C.W. is "not overly bonded" with her current foster mother and the home is not a potential adoptive placement. *Id.* at 92. C.W. has been diagnosed with ADHD and PTSD and has received weekly counseling services since January 2018; she also takes medication for the ADHD. Robinson opined that even given C.W.'s special needs, there exists a reasonable probability that C.W. can be placed with an adoptive family; accordingly, she recommended that appellant's parental rights be terminated. Robinson candidly admitted that her recommendation was difficult because "[w]hat I know for sure is,

[appellant] loves [C.W.] and [C.W.] loves her." *Id.* at 94. However, noting her concerns about appellant's ability to provide for C.W.'s basic needs and to maintain her sobriety and curtail her anger issues, Robinson opined that C.W. would not "get the things she needs" and would not "be as successful" if she were reunified with appellant. *Id.* at 94-95.

{¶ 21} Kevin Everhart, an ACS employee, reported slightly different drug screen statistics than those provided by Robinson, i.e., appellant had 32 negative screens, 55 positive screens, and 83 missed screens.

{¶ 22} Cyndi VanCleve, Program Director for the Recovery Court, testified that appellant entered the program in September 2017. She sometimes displayed disruptive behavior during court hearings such as ripping up paperwork, throwing food, and cursing. Due to appellant's "minimal" participation in the program, she was discharged from the program in April 2018. *Id.* at 135.

{¶ 23} Dr. Douglas Pawlarczyk, the lead clinical psychologist at Netcare Access, testified on appellant's behalf. He conducted a psychological evaluation of appellant on March 26, 2016 pursuant to a referral made by FCCS for the purpose of determining appropriate treatment recommendations to assist appellant in effectively parenting C.W. with the goal of reunification. Because appellant was incarcerated at the time of the evaluation, Dr. Pawlarczyk was unable to observe appellant interact with C.W. Appellant's full-scale IQ is in the "borderline range of cognitive ability." (July 23, 2018 Tr. at 21.) She suffers from PTSD due to her extensive history in the foster care system, which included physical abuse. According to Dr. Pawlarczyk, PTSD often manifests in anger control issues and inappropriate behaviors. Appellant self-medicates with marijuana to reduce the anxiety and anger caused by her PTSD. The most effective treatment for such PTSD cases includes individualized trauma-focused cognitive behavioral therapy.

{¶ 24} Dr. Pawlarczyk further opined that appellant suffers from a dual diagnosis of substance abuse and mental health issues, which requires treatment consisting of mental health counseling with separate substance abuse counseling. He testified that FCCS has not provided appellant with the most effective methods of treatment for PTSD and/or dual diagnosis. He further asserted that removal of a child from the custody of a parent with whom the child is strongly bonded could result in PTSD in the child, which could be further exacerbated by permanent termination of the parent-child relationship.

{¶ 25} Appellant testified on direct examination that C.W. "is the only thing that I have. I didn't grow up with a family, so she is * * * my one and only family that I can count on[.] I didn't have a role model, so I want the chance to be a role model for my daughter. I love her dearly; I live for her; I'll do anything for her." *Id.* at 38-39. Appellant conceded that she made a bad decision leaving C.W. at home alone while she went to work. She averred that since losing custody of C.W., she has learned that she should stay home from work if she does not have childcare because C.W. is "more important than me trying to provide as a single mother," and C.W. "means the world to me." *Id.* at 39. Appellant read a letter she wrote to the trial court in which she professed her love for C.W. and outlined the ways she had benefited from the services she was provided pursuant to her case plan.

{¶ 26} Britani Galloway, C.W.'s GAL, confirmed that C.W.'s current foster care placement is the sixth since August 2015. Galloway attributed the numerous changes in foster placement to C.W.'s aggressive behavior and appellant's negative interaction with some of the previous foster families.

{¶ 27} Galloway visited C.W. in her current foster home five or six times in the preceding year and had no "concerns" with the foster mother. *Id.* at 48. However, she noted that the current foster home is not a "foster to adopt placement." *Id.* at 53. Galloway also visited appellant in her home and found it to be appropriate. After observing one of the visits between C.W. and appellant at FCCS, Galloway determined that appellant and C.W. "are extremely bonded." *Id.* at 49. She described their relationship as being "very natural" and noted that both C.W. and appellant sobbed when the visit ended. *Id.* at 49. Galloway discussed adoption with C.W., concluding that C.W. understood the concept and consequences of adoption. Galloway averred that C.W. continually asserts that she does not want to be adopted and wants to be returned to her mother.

{¶ 28} In a GAL report prepared on May 14, 2018, Galloway noted C.W.'s repeated desire to return home to her mother. She further noted, however, that appellant's behavior was a factor in C.W.'s removal from her previous foster home and that other negative behavior prevented appellant from successfully completing a substance abuse program. Galloway also noted that C.W. had been in FCCS custody since August 2015, had been in several foster care homes, and needed consistency in order to bond. While Galloway ultimately recommended that FCCS be awarded permanent custody of C.W., she indicated

that "[t]his is not a strong recommendation because [C.W.] is very bonded with her Mother. If Mother was clean and was consistent with her medication, she could regain custody." (May 14, 2018 GAL Report at 6.) During her testimony, Galloway reiterated her recommendation, but again stated that "the recommendation is not a strong one" because of the "significant strong bond between appellant and C.W." (July 23, 2018 Tr. at 50.)

{¶ 29} Following the conclusion of testimony and presentation of closing arguments, the trial court continued the case for a non-evidentiary hearing on August 13, 2018. At that hearing, the trial court noted that it had previously informed counsel that it was inclined to deny FCCS's motion, but had determined to allow the parties to continue reunification efforts before formally denying the motion.[3]

{¶ 30} The FCCS attorney reported that appellant had missed ten ACS drug screens since July 10, 2018 and had informed her FCCS caseworker that she felt the ACS screens were unnecessary because she screens for drug use through the probation department in her criminal case. Appellant's probation screen on July 18, 2018 was positive for marijuana. The FCCS attorney further noted that per the court's instructions, FCCS had worked to increase appellant's visitation with C.W. To that end, on July 27, 2018, the FCCS caseworker went to appellant's home to assist her with preparations for a 12-hour visit with C.W. the next day. The caseworker smelled marijuana and observed that appellant's demeanor and physical appearance suggested that she was under the influence; appellant provided no explanation for her behavior. The July 28, 2018 visit proceeded and went well, as did another 12-hour visit on August 4, 2018. According to the FCCS attorney, appellant cancelled a third extended visit because she was stranded in Cleveland.

{¶ 31} Counsel for appellant asserted that appellant was scheduled to begin dual diagnosis counseling the next day, was currently employed, had enrolled C.W. in school, and had obtained daycare services for C.W.

{¶ 32} The trial court questioned appellant about her refusal to screen with ACS; appellant replied that she "[didn't] have an answer for" that. (Aug. 13, 2018 Tr. at 8.) The trial court ordered appellant to submit to a hair follicle screen that day and continued the matter for 30 days. The court admonished appellant that it would terminate her parental rights if she did not maintain sobriety.

---

[3] The discussion to which the trial court alludes was not transcribed for the record.

{¶ 33} At a non-evidentiary hearing on September 24, 2018, the FCCS attorney reported that appellant had missed eight ACS drug screens since August 13, 2018, and that the hair follicle screen was positive for cocaine. As a result, FCCS determined that it was unsafe for C.W. to be in appellant's home; thus, further visitation would be supervised and take place at FCCS. When informed of this change on August 28, 2018, appellant declined further visits with C.W. until after the September 24, 2018 hearing. The FCCS attorney further stated that FCCS had ongoing concerns about appellant's substance abuse and mental health counseling. In addition, FCCS was concerned that appellant's cousin and her children now resided with appellant because the cousin had a history of substance abuse problems.

{¶ 34} Counsel for appellant acknowledged appellant's positive cocaine screen and that she was still using marijuana. Counsel explained that appellant was upset after FCCS changed the visitation schedule; she called a suicide hotline and as a result was hospitalized for several days. She was taking Wellbutrin as prescribed and was set to begin dual diagnosis counseling the next day. She was currently employed and wished to resume visitation with C.W.

{¶ 35} At the close of the hearing, the trial court granted FCCS's motion to re-open the record so the parties could present additional evidence.

{¶ 36} Over appellant's objection, trial was re-opened on February 25, 2019. Robinson testified that in accordance with the trial court's instructions, FCCS had focused on several of the objectives set forth in appellant's case plan in an attempt at reunification, most notably, housing, substance abuse services, employment, and drug testing.

{¶ 37} To that end, Robinson testified that appellant had not consistently completed drug testing through ACS since July 2018; specifically, appellant completed 14 drug screens and missed 48 screens. Appellant provided no explanation for the missed screens. The August 13, 2018 hair follicle test proved positive for cocaine and marijuana. Appellant continued to test positive for marijuana, and in screens on January 7 and February 14, 2019, tested positive for marijuana and alcohol. When Robinson raised concerns about the positive test results, appellant denied cocaine use and "became very escalated." (Feb. 24, 2019 Tr. at 11.) In an effort to increase consistency in appellant's drug test completion, FCCS provided gas cards and changed the testing window to accommodate appellant's

schedule. Due to concerns about appellant's continued substance abuse, Robinson referred her to additional services outside of Guidestone. Appellant refused these referrals because she felt the Guidestone services were sufficient.

{¶ 38} Robinson also testified that FCCS referred appellant to an agency that provided dual diagnosis services. Appellant completed the assessment; however, she refused to sign a release allowing FCCS to obtain the results of the assessment. Appellant informed Robinson that she unable to engage in the services due to employment conflicts. Robinson further testified that through the probation department, appellant linked with an agency in November 2018 for substance abuse counseling; however, Robinson was unable to verify if appellant also received mental health services through that agency.

{¶ 39} Robinson further averred that appellant lost her Section 8 housing voucher in 2018 due to her failure to disclose to authorities that she did not have custody of C.W. As a result, appellant was four months behind on her rent and was facing imminent eviction. FCCS referrals to community programs that provide assistance in resolving arrearages and obtaining housing were unsuccessful due to appellant's failure to maintain stable employment. Robinson conducted a home visit on January 25, 2019 and found the home in disarray. The back door and kitchen window were minimally secured. The victim in appellant's arson case attempted several break-ins; multiple persons had gained access to appellant's home through the kitchen window.

{¶ 40} According to Robinson, appellant's employment status had "ebbed and flowed" since July 2018. (Feb. 25, 2019 Tr. at 17.) Although appellant informed Robinson that she was employed, she refused to provide documentation to substantiate her claim.

{¶ 41} Robinson further averred that appellant attended her supervised weekly visits with C.W. with few exceptions. Appellant and C.W. remain bonded, and C.W. continued to express a desire to be returned to appellant's custody. C.W. has been in the same foster home since January 2018; however, it is not a potential adoptive home. Robinson stated that FCCS will pursue permanent adoption for C.W. if granted permanent custody.

{¶ 42} Galloway testified that C.W. is almost seven years old and in the first grade. She performs well in school and is acclimated to the foster home. Galloway noted that her previous recommendation that the trial court grant FCCS's motion for permanent custody

was "not a super strong one because of the bond between" appellant and C.W. *Id.* at 33. However, she averred that her recommendation is now "stronger" due to ongoing concerns about appellant's drug use, mental health issues, unstable housing, and erratic employment. *Id.* Galloway noted that appellant and C.W. are "definitely bonded," that C.W. "absolutely adores [appellant]," and that appellant is appropriate with C.W. during the supervised visitation at FCCS. *Id.* at 36. Galloway opined that despite the bond between appellant and C.W., and C.W.'s continued assertion that she wishes to live with appellant, the grant of permanent custody to FCCS would be in C.W.'s best interest.

{¶ 43} Appellant testified that she attended counseling services at Guidestone until November 2018 and has received counseling services at another agency since that time. She was set to begin a 90-day intensive outpatient treatment program in a few days. Her dual diagnosis counseling ended due to conflicts with her work schedule. She admitted she lost her Section 8 housing and is currently spending nights in a shelter while searching for a rented room. She was scheduled to move into an apartment on April 1, 2019.

{¶ 44} Appellant admitted she has had difficulties maintaining stable housing and employment due to her criminal record. Appellant asserted that she entered foster care at age eight and that her mother's failure to fight for custody of her was the impetus for her anger issues. She described C.W. as her "mini me," her "best friend," her "everything," her "world," and "who I live for, who I work for, who I grind for." *Id.* at 52. She further stated that C.W. "complete[s] her emotionally * * * mentally, [and] physically." *Id.* at 52-53.

{¶ 45} C.W.'s attorney averred that C.W. continues to express a desire to return to appellant because she loves her very much. According to counsel, C.W. "absolutely does not want to be adopted and wants to go home." *Id.* at 54.

{¶ 46} On March 14, 2019, the trial court conducted an in camera interview of C.W., during which C.W. asserted that she lives with her foster mother and another foster child. Although she likes them both, the other foster child sometimes "steals and lies." (Apr. 15, 2019 Decision & Entry at 15.) She sees her mother once a week; she wants to live full-time with her because she misses her.

{¶ 47} On April 15, 2019, the trial court issued a decision and judgment entry granting FCCS's motion for permanent custody. The court found, pursuant to R.C. 2151.414(B)(1)(d), that C.W. had been in the temporary custody of FCCS for 12 or more

months of a consecutive 22-month period prior to the filing of the motion for permanent custody. The court also found, under R.C. 2151.414(B)(1)(a), that C.W. could not be placed with appellant within a reasonable time and should not be placed with appellant because, under R.C. 2151.414(E)(1) and (2), despite diligent efforts by FCCS and extended periods of time to allow her to demonstrate otherwise, appellant failed continuously and repeatedly to substantially remedy the conditions causing C.W. to be placed outside the child's home, and that appellant's ongoing struggles with significant mental illness and drug and/or alcohol addiction were so severe that she was unable to provide a safe, stable, adequate permanent home for C.W., and had not demonstrated that she is likely to do so within one year.

{¶ 48} Regarding the best interest factors, the trial court found, pursuant to R.C. 2151.414(D)(1)(a), that C.W. established and maintained a strong bond with appellant and is not bonded with her foster parents or other foster children. As to R.C. 2151.414(D)(1)(b), the court noted that during the in camera interview, C.W.'s demeanor was "one of deep sadness." (Apr. 15, 2019 Decision & Entry at 15.) The court further noted the negative effect of C.W.'s long-term instability in foster care, and that C.W. "desperately wants to reunite with her mother." *Id.* As to custodial history under R.C. 2151.414(D)(1)(c), the court found that C.W. had been out of appellant's care since August 2015. The court further found, under R.C. 2151.414(D)(1)(d) that C.W. was in desperate need of a legally secure permanent home, and despite true efforts, appellant had been unable to overcome her mental health and substance abuse struggles sufficiently to demonstrate an ability to provide C.W. with a stable home. The court candidly admitted that "given the emotions and facts in this matter, there is temptation to give mother and daughter additional time to demonstrate an ability to achieve stability." (Apr. 15, 2019 Decision & Entry at 16.) The court concluded, however, that "ultimately, this trier of fact must concede that time for permanency is running out for [C.W.]. If she is not given an opportunity to find a permanent home through adoption she may never do so. No relatives have been identified that have the ability to provide such a placement." *Id.* Accordingly, the court concluded that a legally secure permanent placement cannot be achieved without an order of permanent custody to FCCS. The court also noted that the GAL believed it was in C.W.'s best interest to grant permanent custody to FCCS and allow C.W. to be placed for adoption.

{¶ 49} The trial court ultimately found by clear and convincing evidence that a grant of permanent custody to FCCS was in C.W.'s best interest. Accordingly, the trial court ordered C.W. committed to the permanent custody of FCCS for the purpose of adoption.[4]

{¶ 50} Appellant timely appeals to this court, setting forth a single assignment of error for this court's review:

> The juvenile court's judgment granting permanent court commitment of the minor child to Franklin County Children Services is against the manifest weight of the evidence.

{¶ 51} "A trial court's determination in a PCC case will not be reversed on appeal unless it is against the manifest weight of the evidence." *In re K.M.,* 10th Dist. No 15AP-64, 2015-Ohio-4682, ¶ 13, citing *In re Andy-Jones,* 10th Dist. No. 03AP-1167, 2004-Ohio-3312, ¶ 28. " ' "An appellate court will not overturn a permanent custody order when it is supported by competent, credible evidence." ' " *In re J.R.,* 10th Dist. No. 17AP-698, 2018-Ohio-1474, ¶ 34, quoting *In re M.W.,* 10th Dist. No. 11AP-524, 2011-Ohio-6392, ¶ 20, quoting *In re Siders,* 10th Dist. No. 96APF04-413 (Oct. 29, 1996).

{¶ 52} In reviewing a judgment granting permanent custody to FCCS under the manifest weight standard, " 'an appellate court "must make every reasonable presumption in favor of the judgment and the trial court's findings of fact." ' " *K.M.* at ¶ 13, quoting *In re J.T.,* 10th Dist. No. 11AP-1056, 2012-Ohio-2818, ¶ 8, quoting *In re P.G.,* 10th Dist. No. 11AP-574, 2012-Ohio-469, ¶ 37. " ' "[I]f the evidence is susceptible of more than one construction, we must give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the trial court's verdict and judgment." ' " *Id.* at ¶ 13, quoting *In re Brooks*, 10th Dist. No. 04AP-164, 2004-Ohio-3887, ¶ 59, quoting *Karches v. Cincinnati,* 38 Ohio St.3d 12, 19 (1988).

{¶ 53} "Parents have a constitutionally-protected fundamental interest in the care, custody, and management of their children." *Id.* at ¶ 15, citing *Troxel v. Granville,* 530 U.S. 57, 65 (2000). The Supreme Court of Ohio has recognized the essential and basic right of

---

[4] The trial court also noted that putative father Anthony Fuller never actively participated with FCCS and completed none of his case plan objectives. In addition, the court found that FCCS had presented clear and convincing evidence under R.C. 2151.414(B)(1)(b) and 2151.414(D)(5) that Fuller had abandoned C.W. and, under R.C. 2151.414(E)(4), (10), and (14), respectively, that Fuller had demonstrated a lack of commitment toward C.W. by failing to regularly support, visit, or communicate with her, had abandoned C.W., and was unwilling to provide food, clothing, and other basic necessities for C.W.

parents to raise their children. *Id.*, citing *In re Murray,* 52 Ohio St.3d 155, 157. Permanent termination of parental rights had been described as " 'the family law equivalent of the death penalty in a criminal case.' " *In re K.L.M.*, 10th Dist. No. 15AP-118, 2015-Ohio-3154, ¶ 6, quoting *In re Hayes,* 79 Ohio St.3d 46, 48 (1997). "Because an award of permanent custody is the most drastic disposition available under the law, it is an alternative of last resort and is only justified when it is necessary for the welfare of the children." *In re Swisher,* 10th Dist. No. 02AP-1408, 2003-Ohio-5446, ¶ 26, citing *In re Cunningham,* 59 Ohio St.2d 100, 105 (1979).

{¶ 54} R.C. 2151.414 governs the procedure for granting permanent custody of a child to an agency such as FCCS. Before granting permanent custody, a trial court must make two determinations by clear and convincing evidence. *In re R.G.,* 10th Dist. No. 12AP-748, 2013-Ohio-914, ¶ 6. The court must first determine whether one of the five factors set forth in R.C. 2151.414(B)(1) applies:

> (a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
>
> (b) The child is abandoned.
>
> (c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.
>
> (d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *.
>
> (e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on

three separate occasions by any court in this state or another state.

{¶ 55} Once the trial court finds that one of the circumstances set forth in R.C. 2151.414(B)(1)(a) through (e) applies, the court then must determine whether a grant of permanent custody is in the best interest of the child. *Id.* at ¶ 7. "Clear and convincing evidence is that degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the facts to be established." *In re: R.G.* at ¶ 7, citing *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus. Clear and convincing evidence is more than a mere preponderance of the evidence but does not require proof beyond a reasonable doubt. *Id.*, citing *Cross.*

{¶ 56} FCCS moved for permanent custody under both R.C. 2151.414(B)(1)(a) and (d). "When a child has been in the temporary custody of FCCS for 12 or more months in a consecutive 22-month period, the court need not find that the child cannot or should not be placed with either parent within a reasonable time." *In re D.G.,* 10th Dist. No. 09AP-1122, 2010-Ohio-2370, ¶ 11, citing *In re Williams,* 10th Dist. No. 02AP-924, 2002-Ohio-7205, ¶ 46. "The question of whether the child cannot or should not be placed with either parent within a reasonable time under R.C. 2151.414(B)(1)(a) becomes relevant only where the child has not been in agency custody for the requisite time under subsection (d). Subsections (a) and (d) of R.C. 2151.414(B)(1) are, accordingly, mutually exclusive." *Id.*

{¶ 57} The trial court made findings under both R.C. 2151.414(B)(1)(a) and (d). The trial court found under R.C. 2151.414(B)(1)(d) that C.W. was in the temporary custody of FCCS for 12 or more months of a consecutive 22-month period. Appellant does not dispute this finding and the undisputed evidence at trial supports its. Because the time requirements under R.C. 2151.414(B)(1)(d) were satisfied, it was unnecessary for the trial court to determine whether C.W. cannot or should not be placed with appellant within a reasonable time under R.C. 2151.414(B)(1)(a). *In re: D.G.* Accordingly, because the evidence supports the trial court's finding that R.C. 2151.414(B)(1)(d) was satisfied, the sole remaining issue before the trial court was whether permanent FCCS custody was in C.W.'s best interest. *In re J.R.*, 10th Dist. No. 17AP-698, 2018-Ohio-1474, at ¶ 14. "[T]he focus of the best interest determination is upon the child, not the parent, as R.C. 2151.414(C) specifically prohibits the court from considering the effect a grant of permanent custody

would have upon the parents."  *In re B.B.H.,* 10th Dist. No. 14AP-882, 2015-Ohio-2347, ¶ 20, citing *In re Awkal,* 95 Ohio App.3d 309, 315 (8th Dist.1994).

{¶ 58} R.C. 2151.414(D)(1) requires that, in determining the best interest of the child, the court must consider all relevant factors, including, but not limited to, the following:  (a) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers, out-of-home providers, and any other person who may significantly affect the child, (b) the wishes of the child, as expressed directly by the child or through the child's GAL, with due regard for the maturity of the child, (c) the custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for 12 or more months of a consecutive 22-month period, (d) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency, and (e) whether any of the factors in divisions (E)(7) to (11) of R.C. 2151.414 apply in relation to the parents and child.  The factors set forth in R.C. 2151.414(E)(7) through (11) include: whether the parents have been convicted of or pleaded guilty to certain crimes; whether medical treatment or food has been withheld from the child;  whether the parent has placed the child at a substantial risk of harm due to alcohol or drug abuse; whether the parent has abandoned the child;  and whether the parent has had parental rights involuntarily terminated with respect to a sibling of the child.

{¶ 59} While a trial court need not specifically enumerate each best interest factor in its judgment, it must state sufficient findings on the record to make it clear to the parties that the decision is supported by the facts.  *In re D.G.,* 10th Dist. No. 09AP-1122, 2010-Ohio-2370, ¶ 16, citing *In re Brooks,* 10th Dist. No. 04AP-164, 2004-Ohio-3887, ¶ 22. Accordingly, the court must analyze the best interest factors and state findings to indicate that it conducted the requisite analysis.  *Id.,* citing *Brooks* at ¶ 23.

{¶ 60} In addition, "R.C. 2151.414(D) does not give any one factor 'greater relevance than the others.' "  *In re B.B.H.* at ¶ 23, quoting *In re Schaefer,* 111 Ohio St.3d 498, 2006-Ohio-5513, ¶ 56.  Moreover, the trial court must be free to determine the relative weight to be afforded the factors based upon the particular circumstances of the case before it.  *In re J.L.M.,* 12th Dist. No. CA2015-11-206, 2016-Ohio-2773, ¶ 23.  Otherwise, the question of

whether permanent custody is in a child's best interest would be determined merely by counting whether more factors are in favor or against granting permanent custody. *Id.*

{¶ 61} Appellant challenges the trial court's findings regarding the best interest factors set forth in R.C. 2151.414(D)(1)(a), (b), and (d). As to R.C. 2151.414(D)(1)(a), which implicates the child's interaction and interrelationship with others, the trial court found that C.W. and appellant are extremely close and bonded. Appellant agrees with this finding, and our review of the record reveals that appellant's testimony, the in-camera interview with C.W., and the testimony provided by the GAL and the FCCS caseworker supports it.

{¶ 62} Appellant urges this court to follow *In re Gibson,* 10th Dist. No 78AP-856 (July 19, 1979), where this court stated, "where there is a true parent-child relationship and true love exchanged between the parent and child, permanent commitment is out of the question, even though the mother is unable to provide a proper home for her children." According to appellant, because the evidence presented at trial demonstrates such a relationship between appellant and C.W., the trial court should have assigned the parent-child bond substantial weight.

{¶ 63} Review of the trial court's judgment reveals that the trial court assigned substantial weight to the bond between appellant and C.W. In its judgment, the trial court referred to the bond several times, and noted that the case was "very difficult, especially because [C.W.] is so bonded with her mother." (Apr. 15, 2019 Decision & Entry at 8.) Appellant essentially argues that the trial court should have accorded dispositive weight to the bond between appellant and C.W. As noted above, no one factor in R.C. 2151.414(D) is given greater relevance than the other factors, and the trial court is free to determine the relative weight of each factor given the particular circumstances of the case before it. *In re B.B.H.*; *In re J.L.M.*

{¶ 64} Furthermore, in *In re B.L.,* 10th Dist. No. 04AP-1108, 2005-Ohio-1151, this court rejected a similar *Gibson* argument, noting that *Gibson* "predates the enactment of R.C. 2151.414, which now governs the trial court's resolution of permanent custody proceedings. The language in *Gibson* regarding love and affection flowing between the parties is not found in the new statute and is not a consideration a trial court must consider in making a decision regarding permanent custody." *Id.* at ¶ 25. Again, we understand this

passage from *In re: B.L.* to mean that the bond is not necessarily dispositive. In addition, *Gibson* is distinguishable from the present case, as the analysis there included a finding that the record revealed "no evidence whatsoever justifying a permanent commitment of the two boys." *See In re McMunn,* 4th Dist. No. 88 CA 8 (Jan. 24, 1990). In contrast, the record in the present case contains evidence supporting permanent commitment of C.W. to FCCS.

{¶ 65} Moreover, this court recently has determined that "resolution of [R.C. 2151.414(D)(1)(a)] is not limited to merely the bond between child and parent." *In re K.R.,* 10th Dist. No. 18AP-633, 2019-Ohio-2192, ¶ 81. As we noted in *In re: K.R.,* courts have considered the consistency of a parent's visitation with a child when resolving the R.C. 2151.414(D)(1)(a) factor. *Id.,* citing *In re Schaefer,* 111 Ohio St.3d 498, 2006-Ohio-5513, ¶ 59. Here, the trial court found, and the testimony of the FCCS caseworker supports the finding, that appellant missed at least 25 visits with C.W. over the course of the case, some of which appellant failed to explain. In addition, appellant refused visitation with C.W. from August 28, 2018 through the September 24, 2018 hearing because she was upset that FCCS changed the visitation schedule after she tested positive for cocaine use. In addition, much of appellant's visitation with C.W. required FCCS supervision due to appellant's behavior and failure to make progress on her case plan.

{¶ 66} Appellant also contends that the parent-child bond between appellant and C.W. had "greater significance" because of her "demonstrated commitment" to C.W. and the "substantial efforts" she made to comply with her case plan. (Appellant's Brief at 20-21.) Appellant acknowledges that she failed to stop smoking marijuana; however, she contends that she did not "fail to show love and support for C.W." *Id.* The trial court found that for the most part, appellant interacted appropriately with C.W. during visitation; however, the trial court characterized their relationship as "explosive" and noted that appellant "inappropriately yells at [C.W.] during her visits." (Apr. 15, 2019 Decision & Entry at 6, 7.) In addition, the trial court pointed out other negative issues regarding the relationship between appellant and C.W. that appellant fails to acknowledge. The court noted that despite appellant's participation in parenting classes, she failed to consistently demonstrate appropriate parenting skills and safe judgment. The court found that appellant had failed to establish appropriate parent-child boundaries, had difficulties

modulating her emotional outbursts, provided C.W. with a cell phone containing inappropriate sexual images of appellant, used marijuana in her home prior to a visit with C.W., and directed C.W. to misbehave in her foster homes. The testimony of the FCCS caseworker and the GAL support these findings. Considering all of these factors, and recognizing with the trial court that this is a close case, we cannot find that the trial court erred in its consideration of R.C. 2151.414(D)(1)(a).

{¶ 67} Regarding R.C. 2151.414(D)(1)(b), which addresses the child's wishes, the trial court found that C.W. has been consistent and clear in her desire to reunite with appellant. The record, including the in-camera interview with C.W. and the testimony provided by the GAL, supports this finding. Appellant argues that the trial court should have assigned this factor heightened significance.

{¶ 68} "While [the wishes of the child] is one of many factors under R.C. 2151.414(D), it is not controlling." *In re D.B.,* 2d Dist. No. C.A. No. 2005-CA-33, 2006-Ohio-479, ¶ 42. Here, the trial court considered C.W.'s wish for reunification, but ultimately concluded that it was outweighed by the GAL's recommendation that FCCS be granted permanent custody and by the evidence establishing appellant's inability to effectively address her housing, employment, substance abuse, and mental health issues. Again, a trial court is free to determine the weight to be assigned each of the R.C. 2151.414(D) factors. Accordingly, we cannot find that the trial court erred in failing to accord dispositive weight to C.W.'s wish for reunification with appellant.

{¶ 69} Appellant's remaining arguments pertain to R.C. 2151.414(D)(1)(d), which concerns the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to FCCS. Unquestionably, every child, including C.W., needs a legally secure permanent placement. *In re D.G.,* 10th Dist. No. 09AP-1122, 2010-Ohio-2370, ¶ 25, citing *In re E.G.,* 10th Dist. No. 07AP-26, 2007-Ohio-3658, ¶ 26.

{¶ 70} Appellant argues that C.W.'s numerous foster home placements demonstrate that she is unlikely to form a significant bond with a foster parent. According to appellant, C.W.'s current placement in a non-adoptive, temporary foster home proves that she is not bonded to anyone other than appellant and that FCCS had no prospective adoptive placements available for C.W. Appellant maintains that the continuous cycle of foster

placement, removal, and re-placement is not in C.W.'s best interest. Appellant asserts that C.W.'s deep and strong bond with appellant, coupled with her strong and consistent wish to reunify, demonstrates that the prospects of a successful adoption are unlikely. In essence, appellant contends that she is the only person able to provide a stable home for C.W.

{¶ 71} The trial court found that C.W. is in desperate need of a legally secure permanent home. The court concluded that despite her best efforts, appellant had not demonstrated an ability to provide C.W. a stable living environment. The evidence presented at trial supports this conclusion. As noted above, the FCCS caseworker opined that C.W. would not "get the things she needs" and would not "be as successful" were she reunified with appellant. (May 21, 2018 Tr. at 94-95.) As the trial court noted, appellant did not successfully complete her case plan objectives despite having extensive time to do so. Appellant failed to successfully make progress on, let alone resolve, her ongoing illegal drug use. She admitted inconsistencies in completing required drug screens despite FCCS's provision of transportation assistance and changes in testing windows to accommodate her schedule, and she acknowledged that she had no explanation for some of the missed screens. She tested positive for drug use throughout the course of her involvement with FCCS and continued to self-medicate with marijuana on a regular basis. As noted, at the re-opened trial on February 25, 2019, the FCCS caseworker averred that appellant missed 48 drug screen after July 2018, testified positive for cocaine and marijuana in August 2018, and tested positive for marijuana and alcohol in January and February 2019.

{¶ 72} Appellant also failed to successfully address her mental health issues despite FCCS's efforts to link her with, and provide financial and transportation assistance to and from, various service providers. Appellant's anger issues have persisted and manifested in various settings, including during visitation with C.W., during court proceedings, and in confrontations that ultimately resulted in criminal convictions.

{¶ 73} In addition, appellant's housing and employment circumstances remain unstable. Evidence presented at the reopened trial in February 2019 established that appellant was unable to maintain previously obtained Section 8 housing when it was discovered she did not have custody of C.W.; she was four months behind in her rent, facing imminent eviction, and staying overnight in a shelter. Although appellant stated that she had secured an apartment for April 1, 2019, the trial court noted that appellant had failed

to substantiate this claim. The FCCS caseworker testified that appellant indicated she was currently employed, but refused to provide verification of employment. Appellant attributed her housing and employment difficulties to her criminal record.

{¶ 74} Moreover, changes in C.W.'s foster home placements can be attributed, at least in part, to appellant. The trial court found that appellant had directed C.W. to misbehave in her foster homes, and that foster placements had to be changed due to appellant's disruptive behavior. Testimony from the FCCS caseworker and the GAL supports these findings.

{¶ 75} In addition, contrary to appellant's assertion that no testimony was presented regarding a prospective adoptive home for C.W., the FCCS caseworker testified that even given C.W.'s special needs, a reasonable probability existed that C.W. could be placed with an adoptive family and that FCCS would pursue permanent adoption if granted permanent custody.

{¶ 76} Moreover, the permanent custody statutes do not require FCCS to prove that adoption is likely. As this court held in *In re V.B.-S.,* 10th Dist. No. 13AP-478, 2013-Ohio-5448:

> [T]he statutes governing permanent custody simply do not require an agency to prove that adoption is likely. It is true that the likelihood that a child will be adopted may be considered in determining the child's best interest. See R.C. 2151.414(D)(1)(d). * * * But the statutes contemplate that all the statutory best interest factors must be considered and, although the likelihood of adoptions weighs in favor of such an award, the absence of the likelihood does not preclude the court from finding that an award of permanent custody is in the child's best interest.
>
> This conclusion is consistent with the Supreme Court of Ohio's express recognition that 'while a juvenile court reviewing a motion for permanent custody was at one time required to consider the child's probability of being adopted, * * * the current statutory framework does not expressly require the court to consider this information in making a best-interest determination.' *In re T.R.,* 120 Ohio St.3d 136, 2008-Ohio-5219, ¶ 14, 896 N.E.2d 100. 'While it certainly may be helpful for a court to know the agency's adoption plans, the court is not required to factor adoption possibilities into its analysis, and the agency will be bound to seek adoption for the child if permanent custody is granted

> regardless of whether the plans are filed before the motion is considered.'  *Id.* at ¶ 16.

*Id.* at ¶ 51-52.

{¶ 77}  The trial court recognized the urgency of finding a permanent home for C.W. Indeed, the court observed that the temptation to allow appellant additional time to achieve stability was outweighed by the fact that "[i]f [C.W.] is not given an opportunity to find a permanent home through adoption she may never do so."  (Apr. 15, 2019 Decision & Entry at 16.)   The trial court further relied upon the GAL's recommendation that grant of permanent custody to FCCS for purposes of adoption would be in C.W.'s best interest.

{¶ 78}  Considering all the foregoing factors, we cannot find that the trial court erred in its consideration of R.C. 2151.414(D)(1)(d).

{¶ 79}  After a thorough review of the record, we commend the trial court for its diligent efforts in carefully and thoughtfully considering the issues in this case.  Indeed, the court re-opened the trial, which allowed appellant further opportunity to complete her case plan objectives.  The trial court has also provided a thorough and well-reasoned decision for our review.  As the trial court noted in its judgment, this case is a very difficult one, given that C.W. is so bonded with appellant.  Nevertheless, when considering all the facts and circumstances, we conclude that the trial court's judgment granting FCCS permanent custody of C.W. for purposes of adoption is supported by competent, credible evidence and is not against the manifest weight of the evidence.  Accordingly, appellant's assignment of error is overruled.

{¶ 80}  Having overruled appellant's single assignment of error, we hereby affirm the judgment of the Franklin County Court of Common Pleas, Domestic Relations, Juvenile Branch.

*Judgment affirmed.*

BRUNNER and NELSON, JJ., concur.

BRUNNER, J., concurring.

{¶ 81}  I concur with the opinion of the majority and would change references in the majority decision from "dual diagnosis" to "co-occurring disorders."  Since at least 2007, the term "dual diagnosis" has been disfavored and replaced by the term, "co-occurring disorders," according to clinical journals and government standards.  This is in part because

such mixed diagnoses involving substance abuse and mental health disorders suffered by the same individual are complex and often do not involve simply two disorders of the brain.

> Dual diagnosis was first identified in the 1980s among individuals with coexisting severe mental illness and substance abuse disorders. Today, the Substance Abuse and Mental Health Services Administration (SAMSHA) uses the term *co-occurring disorders* (COD) to refer to the aforementioned concurrent disorders. COD is defined as co-occurring substance related and mental disorders. Patients said to have co-occurring disorders have one or more substance-related disorders as well as one or more mental disorders.

(Emphasis sic.) Hryb, Kathryn, MSW, Kirkhart, Rob, PhD, PA-C and Talbert, Rebecca, PharmD., *A Call for Standardized Definition of Dual Diagnosis*, Sept. 2007 https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2880934/ (accessed Mar. 26, 2020).

{¶ 82} While the record contains testimony that C.W.'s mother was diagnosed as "dual diagnosis," I do not believe we are constrained by that terminology in our decision. I believe we would do a greater service to the public and legal community to recognize contemporary terminology and understanding in substance abuse and mental health treatments.

{¶ 83} The trial court heard testimony that FCCS was unable to provide C.W.'s mother with the most effective methods of treatment for PTSD and/or "dual diagnosis." (Majority decision at ¶ 24.) This may not be surprising because dual diagnosis is a limiting diagnosis. "Dual diagnosis" creates a single category for a diverse group of individuals whose needs and problems are complex and varied. Co-occurring disorders, on the other hand, may be multiple within each category of substance abuse disorders and severe mental health disorders, including trauma or PTSD, such as was the case with C.W.'s mother.

{¶ 84} This separate opinion is simply an attempt to ensure that the Court recognizes the complexity of the human situation involved and the limitations in substance abuse and mental health treatments which continue to evolve as the last human frontier, the brain, becomes better understood by medical professionals and clinicians, and eventually, by the public.

{¶ 85} Other than on this point, I concur with the decision of the majority. Based on what appears in the record, the trial court and related professionals appear to have done what they could under the circumstances to avoid separating a strongly bonded mother and

daughter. Perhaps at some point in the future, C.W. will realize that, even though she and her mother have a strong bond of love, the complexity of the situation under the state's laws to protect children and the limitations of existing treatment for the variety of conditions her mother battles, have together constrained the possibility of mother and daughter being able to live together during C.W.'s childhood.

_____