[Cite as *In re Ki.K.*, 2025-Ohio-5168.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
SANDUSKY COUNTY

In re Ki.K., Ky.K., Ma.K.       Court of Appeals No.   {72}S-25-014
{72}S-25-015
{72}S-25-016

Trial Court No.   22330154
22330155
22330156

**DECISION AND JUDGMENT**

Decided: November 14, 2025

* * * * *

Dean E. Ross, for appellee.

Laurel Kendall, for appellant.

* * * * *

**DUHART, J.**

{¶ 1} This is a consolidated appeal from the March 17, 2025 judgment of the Sandusky County Court of Common Pleas, Juvenile Division, terminating the parental rights of appellant, M.K. ("mother"), and granting permanent custody of three of her children to appellee, Sandusky County Job and Family Services ("agency"). For the reasons that follow, we affirm the judgment.

**{¶ 2}** Mother sets forth five assignments of error:

I. The trial court's finding pursuant to R.C. 2151.414(E)(1) that mother failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home was not supported by clear and convincing evidence.

II. The trial court's finding pursuant to R.C. 2151.414(E)(3) that alleged neglect as a result of domestic violence perpetrated by [J.H.] against mother, in July 2024, between the initial Complaint (July 2023) and the motion for permanent custody (December 2024), which was dismissed by the trial court, was not supported by clear and convincing evidence as to mother.

III. The trial court's finding pursuant to R.C. 2151.414(E)(15) that mother allowed the children to suffer neglect as described in section 2151.03 of the Revised Code, and the court determines [sic] that the seriousness, nature, or likelihood of recurrence of the neglect makes the children's placement with the parent a threat to the child's safety was not supported by clear and convincing evidence.

IV. The trial court's finding pursuant to R.C. 2151.414(E)(16) (i.e. any other relevant factor) that mother failed to utilize opportunities to use the skills and training that were invested in her to address the "multiple needs and behaviors of the children that require special services" was not supported by clear and convincing evidence.

V. The trial court's finding pursuant to R.C. 2151.414(E) that none of the children here can be placed with any of the parents within a reasonable amount of time, and that none of them should be placed with any of the parents, was not supported by clear and convincing evidence.

## Background

**{¶ 3}** Mother has five children: J. (born in September 2012), Ki. (born in January 2018), Ky. (born in February 2019), Ma. (born in May 2020) and N. (born in August 2022). Permanent custody of three of the children, Ki., Ky. and Ma., was awarded to the

2.

agency, which mother is now challenging on appeal.[1] All of the children have different fathers. None of the fathers participated in the permanent custody trial, and none of the fathers are parties to this appeal.

{¶ 4} The agency has been involved with mother and her children for years, which included eight investigations and three ongoing cases. The present case was opened in 2023 after the agency received reports that the five children were not being supervised and were neglected. More specifically, Ma. was almost hit by a car in the parking lot of the apartment complex where the family lived.

{¶ 5} On July 31, 2023, the juvenile court granted an ex parte order for temporary custody of all five children to the agency; the children were removed from mother's home and placed in foster homes.

{¶ 6} On August 1, 2023, the agency filed a complaint alleging the five children were neglected and dependent. On August 22, 2023, the five children were adjudicated dependent and Ki., Ky. and Ma. ("the three children") were also adjudicated neglected.

{¶ 7} On August 30, 2023, a case plan was filed which set forth the case plan services necessary for mother's reunification with the children. Mother's services included individual counseling, medication services, parenting services, maintaining her home, signing releases, attending visits and meeting with the agency. The three children's services included counseling for mental health and behavioral issues.

---

[1] Legal custody of mother's other two children was granted to relatives. The custody of these two children is not at issue in this appeal.

3.

{¶ 8} On September 15, 2023, the court ordered the disposition of temporary custody of the three children to the agency. Thereafter, mother worked on her case plan services as well as a transition plan for some of the children to return to her home.

{¶ 9} In July 2024, mother's live-in boyfriend, J.H. (who is Ma.'s father), assaulted mother. The police arrested J.H. for aggravated assault. At that time, the agency learned there had also been a domestic violence incident ("DV") the previous week between the couple, which was not reported. As a result, the transition plan was stopped, and mother's visits with the children were supervised.

{¶ 10} On December 6, 2024, the agency filed a motion requesting modification of temporary custody to permanent custody and a motion for a permanency hearing. The agency requested permanent custody of, inter alia, the three children, pursuant to R.C. 2151.414(B)(1)(a), (b) and (d), as it was in the children's best interest.

{¶ 11} On February 21 and 22, 2025, the final hearing was held before a magistrate.

{¶ 12} On March 17, 2025, the magistrate issued her decision in which she concluded that the three children had been in the agency's temporary custody for more than 12 months out of a consecutive 22-month period, pursuant to R.C. 2151.414(B)(1)(d), and it was in the children's best interest to grant permanent custody to the agency. That same day, the juvenile court adopted the magistrate's decision as the judgment of the court. Mother appealed the juvenile court's judgment but did not file any objections to the magistrate's decision.

4.

**The Permanent Custody Hearing**

{¶ 13} The agency called the following witnesses to testify at the hearing: the ongoing caseworker, two foster mothers and the guardian ad litem ("GAL"). Mother also testified. The testimony relevant to the appeal is summarized below.

**Caseworker Angela Weaver**

{¶ 14} Angela Weaver, the ongoing agency caseworker testified to the following. The agency has been involved with mother since 2020 and offered mother numerous services like outside parenting, in-house parenting education, a parenting aide and a parenting coach ("coach"). The coach observed a visit between mother and the children to assess the children's behaviors and interactions to determine what the needs were in order to formulate a plan to help mother with parenting skills and techniques to ensure the children were safe. The coach authored a formal assessment and worked with mother from December 2023 through about July 2024, by watching visits at the agency and reviewing strengths or areas which still needed work. Later, the coach went to mother's home, along with a parent aide, to offer assistance during visits.

{¶ 15} The children had serious behavioral issues, physical aggression with each other and sexualized behaviors between them, so they could not be left alone with each other. The children had experienced trauma from physical abuse, inattentiveness and a lack of supervision by mother, moving from place to place, changing schools and unsanitary conditions in the different homes where they lived with mother. Ki. asked Ky. to touch him sexually. Ky.'s behaviors at school included hitting other children, pulling

hair, using profanity, running out of the classroom, calling his teacher names and throwing a chair at the teacher. At home, Ky. was aggressive - he kicked a small child in the face causing a black eye. Ma. was very relaxed and comfortable in her foster home and was "beyond thriving." She was silly, smiling and overall, a very happy girl. During the juvenile court proceedings, which lasted 18 months, Ki. had five placements and the last was a treatment foster home, Ky. had three placements and moved to Utah in February 2025 to live with a relative and Ma. had one placement.

{¶ 16} Mother participated in case plan services, for the most part, but behaviorally, she was not consistent and did not follow-through, and at one point, she stopped taking her medication, so she felt angry, aggressive, and agitated. Mother knew the parenting tools, like setting boundaries and recognizing safety concerns, but she did not use them consistently, so she was unable to show that she remedied the conditions which caused the children's removal from the home. One constant factor with mother was that when she was having partner or relationship issues, the children were not her priority. In addition, mother's partners were not safe people and were not good for the children.

{¶ 17} By July 2024, mother was working on a transition plan for some of the children to return home and J.H. was going to be the children's caretaker when mother was at work. However, the agency discovered that on July 7, 2024, J.H. assaulted mother after he accused her of cheating. He tried to get her phone and then attacked her - he ripped her hair out, punched her, hit her, strangled her, choked her, prevented her from

6.

leaving and pulled a knife on her. Mother suffered bruises and was missing "chunks of hair." When mother was able to get away, she went to a friend's house, and they went to the police station to report the assault. Mother did not want J.H. charged, she just wanted something on file. Nevertheless, J.H. was arrested and charged with aggravated assault. The agency then learned that about two weeks prior, there was another DV between mother and J.H., which mother did not report to police or the agency. The agency also found out that J.H. had been drinking for three months, he and mother verbally argued, and he threatened mother that if she called the police or told anyone about the fights, she would not get her children back.

{¶ 18} J.H. was charged with a felony because he had a previous DV. Mother did not appear in court because she did not want the charges pursued. Due to the assault, the agency no longer worked to transition the children to mother's home, and mother's visits were supervised at the agency.

{¶ 19} Weaver talked to J.H. after the assault and he admitted that he had been drinking, and he and mother were fighting. He was stressed with their relationship and stressed that his daughter, Ma., was not coming home. He had concerns with mother's parenting because she was always on her phone and not watching the children, and mother did not keep the house up, so if he did not clean, no one would.

{¶ 20} J.H. reported when he got out of jail, he had nowhere to live and he refused to stay at a shelter, so he was sleeping in his car at Walmart.

7.

{¶ 21} At the end of August 2024, Weaver phoned J.H. He told her not to call anymore unless it was about Ma. and he hung up. Weaver did not have contact with J.H. again until January 2025, after the agency received a call that J.H. was living with mother and they were in a relationship again. That night, Weaver drove by mother's house and saw J.H.'s car there. Weaver stopped and knocked on mother's door, but no one answered.

{¶ 22} The next morning, Weaver drove by mother's house again but did not see J.H.'s car so Weaver drove to the Kroger parking lot which is next to mother's apartment complex and saw J.H.'s car there; he was not in his car. Weaver met with mother that day and asked if J.H. was at mother's home, but mother did not want to answer. Weaver found out J.H. had been served with the permanent custody complaint at mother's home and Weaver showed mother the proof of service. Mother asked why Weaver was stalking her; Weaver said she had a job to do. Weaver asked mother why the car would be moved if there was nothing to hide. Mother said Weaver would not understand and mother was trying to help J.H. because he had surgery and lost his toes due to living and sleeping in his car. Mother said J.H. wanted to meet with Weaver; an appointment was made, but J.H. was a no-show.

{¶ 23} On February 14, 2025, J.H went to the agency and met with Weaver and they discussed that J.H. had not seen Ma. since July 6, 2024, J.H. was not in services, and was not in communication with the agency. Weaver told J.H. that if he was in a relationship with mother, they had to get into services.

8.

{¶ 24} Regarding mother's relationships, after the July 7, 2024 incident, the agency received reports that a man was staying at mother's home. Weaver went to the home and mother told Weaver not to come out to the house anymore without an attorney present. Later, Weaver met with mother and mother admitted a man had been staying with her for a month, but mother did not want to share his name. When Weaver asked if the man would be safe around the children, mother said probably not. Weaver reminded mother that she needed to live her life like her children were in the home and put her children first before relationships.

{¶ 25} With respect to visits, mother usually brought food and never missed visits, but the visits were generally very chaotic with a lot of screaming, fighting and physical aggression. Mother did not know how to control the children, set boundaries and limits or redirect the children. She made threats to the children about getting in trouble for their behaviors, but she failed to follow through. Weaver recalled a visit in January 2024 which went very well as mother stopped the children's behaviors, redirected them, followed through and set boundaries and limits. But the next visit was complete chaos again. Mother's patterns include lack of follow-through, putting the children in unsafe situations, lack of supervision and living in unsanitary conditions.

{¶ 26} Weaver said the children need permanency, a solid foundation, and they would not improve until they knew where they would be. Ma. thrived off of consistency and routine, and since she did not have a placement change during the case, it was the most consistency she had in her life.

9.

**Foster Mother L.S.**

{¶ 27} L.S. testified to the following. She was a licensed childcare provider, with a specialty in behavioral children and special needs children. L.S. babysat for all five of mother's children and L.S. and mother became friends. L.S. noticed Ki. and Ky. acted inappropriately and that Ki. was obsessed with having Ma. pull up her dress then laugh about it. One time, Ki. was lying on top of Ma. so L.S. had a sit-down talk with Ky. and Ki. and it never happened at her house again. L.S. informed mother, but mother did not understand or know why it kept happening or from where the children got it.

{¶ 28} When the children were removed from mother's house "the last go-around,"[2] Ky. stayed with L.S., then about four to six months later, Ki. went to stay with L.S. In addition, L.S. was approved by the agency to supervise mother's visits with the children, and a concern L.S. had was that mother was on her phone, so L.S. would stand over mother and tell her to put the phone down.

{¶ 29} L.S. welcomed mother into the house and made her part of the family, and always had an open-door policy, so that mother could stop by L.S.'s house anytime to see the children. Initially, L.S. and mother talked every day, texted a lot and often visited, but in early 2024, L.S. hardly heard from mother, "it just started dwindling and dwindling, and [L.S.] didn't question it . . . [but] [t]he boys did. That's not something you start and you stop, especially during a process like this . . ." Mother said J.H. accused her of going

---

[2] Presumably, L.S. was referencing previous times that the agency was involved with the family.

10.

to L.S.'s house to see another man and J.H. did not like mother to stay long at L.S.'s house.  L.S. said mother did not consistently check on her children's well-being or see what they were doing, although L.S. thought that "a mom who's not with their children wants to know what they're doing everyday."  L.S. felt like mother was absent because of J.H.

{¶ 30} At some point, mother started a friendship back up with Ky.'s father, but he gave L.S. "a really weird vibe."  L.S swallowed her pride, "trying to be around this guy and make it the best possible environment and setting for [Ky.]."  But then, Ky.'s father showed L.S. something inappropriate on his phone "and it wasn't accidental."  L.S. told mother and said Ky.'s father could not come over anymore.  "[T]hen, all of a sudden, he didn't know [L.S.] was black . . . and then [mother] told L.S. he was racist . . ."  L.S. did not want Ky.'s father around the children because he was not very friendly to Ki. and Ki. did not "have anything nice to say about the man, and [L.S.] wanted [Ki.] to be heard."  Also, Ky.'s father brought out the worst in Ky.  L.S. did not want mother's friendship with Ky.'s father to go any further because "it prevented her from getting her kids back, but it seemed like it got more intense . . ."

{¶ 31} L.S. believed mother was not consistent and did not know how to parent her children, but she was not a bad parent.  L.S.'s concerns were mother liked the attention of a man and wanted to be loved by everybody but her children.  L.S. thought "your time with your kids is your time with your kids.  When you come visit, you come see them. . . [You] . . . put your stuff down, pay attention and give them your undivided

attention, 'cause you don't know where you're going to see them again." Mother "spent most of her time proving herself or arguing with somebody, a man . . ." L.S. saw the men that mother had around the children and did not like the interaction, and felt that mother put herself in situations that were not good for her or the children. L.S. said it was an issue of neglect with mother.

{¶ 32} With respect to July 6 and 7, 2024, L.S.'s family including Ki. and Ky. went to Cedar Point and L.S. invited mother, who joined them, although later in the day. L.S. recalled they "had a really good time. Nice dinner on the water . . . They had a fireworks show, it was pretty cool. [Mother] said she didn't want to go home . . . but she ended up going home." Within about an hour, mother called and said "she's scared. She's terrified . . . [S]he did not want to be there anymore." L.S. was "pretty sure [mother] stayed too long with . . . her kids, and . . . they got into it, and they were physically fighting one another." Mother said she was red around the neck, J.H. strangled her, she could not breathe, she was afraid and wanted to come over to L.S.'s house.

{¶ 33} Mother went to L.S.'s home and slept on the floor in Ki. and Ky.'s room. Later, one of the boys asked why mother's neck was red. Ki. admitted he saw fighting and arguing at mother's house during the transition period, and he would hide in his closet or under the bed. Ki. "saw stuff that he just didn't . . . tell [L.S. about] because he wanted to go home . . . He knew if he told, . . . they wouldn't go home."

{¶ 34} L.S. and her husband told mother she had to make a police report and mother "was all for it. She wanted to. She was terrified. She did not want to go home."

12.

L.S. said the children could not go home to that, and L.S. did not want J.H. in mother's home when the children were there as he "was back drinking. He was an alcoholic. He was really mean when he drank." L.S., her husband and mother went to the police station and mother made a report. J.H. was arrested and told the police that he had strangled mother on another occasion.

{¶ 35} L.S.'s "concern comes in about the right decisions, the safety of the kids." L.S. tells mother, when mother shares information, "that probably isn't the right way to go, or you probably shouldn't hang around this person, or this isn't probably what you should be doing . . . [I]t's always an excuse, and . . . she means well . . . but these choices and decisions are affecting all these babies['] lives."

{¶ 36} L.S. described how prior to October 2024, Ki. started misbehaving and he and Ky. got in trouble together at school so they could meet up with each other "because they knew one would go to the Principal's Office, the other one would go to the Assistant Principal's Office." The behaviors occurred the day before visits, on visit days and the day after visits with mother. The boys were "flipping tables, cussing people -- never done it before -- not with [L.S.], trying to pull the smart boards off the walls, . . . running, which they haven't done since [L.S.] got them . . . [and] saying some . . . weird stuff, stuff they didn't even say at home."

{¶ 37} In October 2024, things "just got really horrible, like, it got really, really, really, really bad . . ." L.S. has cameras in her house and saw that Ki. was waking Ky. up at night, so they were put in separate bedrooms and Ky.'s "life got better." Then, L.S.

13.

caught Ki. trying to sneak into Ky.'s room. L.S. talked to Ky. but he "denied that [Ki.] had been in [Ky.'s] room, said anything to him, or touched him, did anything of that nature." However, Ki. told Angela Weaver that he had touched Ky. Still, Ky. said Ki. did not touch him, but Ky. admitted that Ki. went into the bedroom and tried to wake him up. L.S. moved Ky. into her bedroom, on a cot, and soon after Ki. left L.S.'s house.

{¶ 38} After Ki. left, Ky. started regressing and "[i]t got really, really, really, really intense, and he took it to school, and it never stopped. It got worse." Ky. was aggressive at school - "kicking, fighting, biting. He was punching girls in the face." Ky. was sent home early from school every day due to behaviors, but "[h]e was totally a different person when he walked in [L.S.'s] front door. . . he would be completely fine." L.S. felt if Ky. could start anew with his aunt in Utah, things could change for him.

{¶ 39} L.S. did not see a change in mother's behavior and could not believe that "[J.H.] and her are even . . . under the same roof and in the same space." L.S. told mother in the past that J.H. does not like Ky. and mistreated Ky. because Ky. was "another level of behavior, he will be mistreated if [L.S.'s] not around." L.S. wanted Ky. to go to Utah "instead of him being in all of this" because she saw "the cycle happening still," which was J.H. was back, he was controlling and not a nice person, but mother allowed him in the children's space, and the children do not have much of a voice. J.H. was part of Ky.'s trauma and Ky. was "extremely behavioral on every spectrum."

**Foster Mother H.H.**

{¶ 40} H.H. and her partner were the caregivers for J., Ma. and N. when they were removed from mother's home. They were still Ma.'s caregivers; J. and N. were placed with relatives.

{¶ 41} When Ma. first arrived, she was three years old, really small, she had a dress on which was a bit dirty, she had no shoes, and her hair was tangled and it took two hours to detangle. Ma. cussed a lot - she would whisper to J. to shut the f up, and Ma. was somewhat aggressive toward N. and bit and hit her. Ma. twirled her hair, and did it so much, it would fall out; she would then eat her hair. Ma. was an "oral seeker" and would put pretty much anything in her mouth - sticks, leaves, so Ma. was given sensory necklaces which were made for chewing.

{¶ 42} Ma. was bitten in the face by a dog shortly before she was placed with H.H., so H.H. and her partner took Ma. to Michigan for follow-ups for the scar on her face. Ma. also had an appointment for her umbilical hernia.

{¶ 43} Ma. attended preschool, and depending on the day, did really well or was super emotional - she was not really able to control her emotions. Ma. took ballet and loved to dance.

{¶ 44} H.H. and her partner would like to adopt Ma. if the agency is granted permanent custody.

**Mother**

{¶ 45} Mother testified to the following. During a previous agency investigation, she and the children were at a homeless shelter, and it was reported that the children were running out and almost getting hit by cars on the street; mother said that was "[h]alf correct." She was asked if supervision was a concern with most of the agency's investigations, and she said, "[i]n a sense."

{¶ 46} Mother revealed she had others, like Ky.'s father and J.H., living in her home and spending the night when the children were there. She did not make the best choices regarding people she allowed around her children. She also disclosed that Ky.'s father was violent towards her one time.

{¶ 47} Mother was asked if structure, supervision and stability were difficult when five children were at home and she said, "it was difficult with -- there was a lot of factors that played into that. . . [S]o the amount of children, as everybody says, [she] was by [her]self for most of it . . . the behaviors with the kids and . . . [she] . . . struggled with it a little bit, especially when [she] did try to . . . say that there was something going on [with Ky.], but nobody wanted to listen, especially, like with doctors . . . and it just -- it escalated." When Ky. was two years old, mother "felt that something was off with him" so she "told [the doctors] . . . and they said he was acting like a normal toddler because he was two."

{¶ 48} Mother said Ki.'s behaviors were "some anger issues . . . the sexualized behaviors; ah, he still liked to escape from the house. . . other than that, [she did not]

know." Ki. was not in counseling "because you can't start counseling until they're at least, I think it was three." After Ki. turned three, she did not put Ki. in counseling because she "didn't think he needed it at the time."

{¶ 49} Mother said Ky.'s behaviors were that "[h]e gets overstimulated a lot and . . . has a hard time, like, coming back down . . . he has sexualized behaviors, too, ah, but, other than that, like . . . [she did not] know some of what's going on with them." Mother was asked why, when Ky. turned three or four years old, she did not see if Ky. could do play therapy or counseling, and she said she "didn't know about some of that stuff." When asked why she did not take Ky. back to the doctor when the doctor said Ky. had to be three years old, she said "[t]hey didn't tell [her] they had to be three. . . [She] didn't find that out [about counseling] until [she] started taking them, and they were past three."

{¶ 50} Mother was not aware of any behaviors with Ma. Mother was asked if she heard L.S. say that Ma. would lift her dress up in front of the boys, and mother said, "Yes. What are you asking?" Mother was asked if she knew if anything happened to Ma., sexually, and mother said she "didn't know any of that was going on."

{¶ 51} With respect to Ma.'s dog bite, at that time mother had a previous ongoing case with the agency, so she and the five children were living with husband and wife, J.K. and L.K. Originally, the family was "safety planned, and then it . . . led into the ongoing."[3] J.K. and L.K. bought dog food and were in their kitchen getting ready to feed their dog. J.K. had the dog get out of the kitchen, but the dog snuck back in. Ma. was by

---

[3] Mother also testified there was no case open at that time.

17.

the sink when J.K. poured the dog food and the dog started eating. Ma. stumbled because she was still little and accidentally stepped on the dog's paw. Mother said, "it all happened quickly, and then she was screaming and crying and [mother and L.K.] took her to the hospital." The other four children were left with J.K., who mother trusted. However, mother had concerns with L.K. and J.K. because "they were not very nice as far as the way they talked." Ma. was transferred to a hospital in Michigan, and mother and J.K. drove up there.

{¶ 52} Mother admitted that was not the initial story that she told, as she made up a story that a stray dog bit Ma. because J.K. and L.K. "didn't want their dog to get in trouble, and it was a very tough situation." Mother was afraid she was going to be homeless and did not "make the right choice . . . they basically wanted [mother] to lie, so that way their dog didn't get in trouble . . ." Mother made up a "crap story" that Ma. "might have -- she must have got outside or went outside before everybody else was going outside and a stray dog came up and bit her."

{¶ 53} Since the children's removal in July 2023, mother was in counseling, went to a psychiatrist, took a parenting class and had a coach. She learned from the parenting classes and coach "to parent gentle a little bit, ah, because [she] used to yell a lot . . . [and] sometimes you just need to give them a minute to, like, come down from whatever's going on with the kids and give them some space and then go back and talk to them . . ." Regarding supervision, mother learned she cannot let the children out of her sight. As to structure and stability, she said, "they didn't used to have a routine when

18.

[she] had them; ah, given everything that has happened and they've gone through, ah, [she] realize[s] that that's one thing that should have -- you know, [she] should have implemented a lot more was having the -- the daily routine and set of rules, um, just the basics."

{¶ 54} To ensure structure in her home, mother said she had cameras in her old apartment, there were door alarms on the doors, she had a baby gate when it was needed, the children were not allowed upstairs unattended, and they always had to be in her eyesight.

{¶ 55} Mother was asked if she knew about the inappropriate conversations that J. had with J.H. about her menstrual cycle during a visit, and mother said not at first, but once she was told, it was "towards the end of the visit, so there really wasn't nothing to do." Later, mother asked J.'s caregiver to talk to J.

{¶ 56} Regarding the first DV which occurred the week before the July 7, 2024 assault/second DV, J.H. choked mother and she dug her nails into his arms for him to let go. She said "it wasn't consistently going on, and the time with the kids was going good . . ." Also at that time, J.H. was the caretaker for J. and Ki. when mother was at work, and there were never any issues, to mother's knowledge.

{¶ 57} Mother attended the children's medical and counseling appointments until the second DV which transpired because J.H. asked to see her phone, she told him no, "he said he was going to get the phone, and then . . . he got it and [she] tried to get it back. Everything happened." She called L.S. from her other phone, left home and went

19.

over to L.S.'s house.  In the morning, mother told L.S. and her husband what occurred, and they told her to "at least go put it on record so if he would try to do anything," she would be protected.  Mother went and made the report, and the police chose to press charges.  Mother was concerned and fearful that if she reported the DVs she would lose her children.  When asked what "everything happened" meant, she said it was all in the police report.  She admitted J.H. choked her and she could not breathe.  Her plan to protect her children after the second DV was to "just have him out of the house, and then it would be safe."

{¶ 58} At the time of the two DVs, J.H. was drinking and mother had not taken her bipolar medication for a couple of months; the medicine was to help keep her anger under control.  She stopped taking the medicine because she did not like the way that it made her feel, but now she knows that was a problem, as she could tell when she was off of it that she needed to go back on it.  So, she will not stop her medication without first talking to her psychiatrist.  Mother said when J.H. drank, he sometimes got angry - never violent - and got in her face.  Mother admitted, however, there was some light pushing or grabbing to get away from each other.

{¶ 59} After the second DV, mother had another man stay with her at her house.  Caseworker Weaver stopped over and asked if mother was willing to share the man's name, but mother would not because "it was irrelevant.  It's still irrelevant."  Weaver asked if he was somebody the agency would approve of to be around her children, and

20.

mother said probably not. Mother was asked if he was the man that J.H. accused her of cheating with and mother said no, she was not cheating on J.H.

{¶ 60} Mother did not know where the boys' sexualized behaviors came from, including when they acted out on each other. The only thing she could think of was after everyone went to bed, she "would wake up the next morning and [her] phone would be in [J., her oldest daughter's] room, so [J.] got [mother's] phone in the middle of the night. They -- they could have been watching anything . . ."

{¶ 61} Over the past few years, mother moved eight times, which she acknowledged was not stable housing, but "[i]t wasn't by choice. . ." Those moves included her aunt's place, then a friend's place in Clyde until the landlord found out. From there, mother and the children went to the Liberty Center, and next stayed in a hotel for two weeks. After that, mother stayed with her dad while she was waiting on an apartment on Mosser Drive, where she then moved. Last year, she moved into another apartment.

{¶ 62} Mother thought Ki., Ky. and Ma. wanted to live with her, and when asked if she thought that was in their best interest, she said, "Yeah, I do. . . Because I'm their mother, and, . . . I know . . . it's a lot, you know, especially with their behaviors, but, at the end of the day, I that's what I still feel." She was asked if she would have any parenting issues with three children in the home and she replied, "I mean, it's possible. . . they are behavioral." She also said she "would do [her] best and see to it" to handle any issue that would come up if she had all three children.

21.

{¶ 63} Mother worked at Taco Bell, had a stable place to live and J.H. lived with her "[b]ecause he didn't have anywhere else to go, and he needed to have a place to recover after he got his -- had his surgery." When asked how, with him in the house, she would keep her children safe, she said, "(Sighing), I mean, obviously, I wouldn't let nothing happen . . ." and would not leave the children alone with him. Mother was hoping that J.H. would eventually get his own place.

{¶ 64} Mother thought she had the necessary tools to supervise and provide structure and stability for the three children and would try to utilize those tools on a consistent basis. Mother was asked why she was not using those tools every time she had visits with the children because the visits were not always good and she said she only had two hours a week with the children, so "it's kind of hard. You can try, but it doesn't always go that way." The visits were not always structured, which she blamed, in a sense, on the visits being only two hours. She said before the second DV, the visits were really good, and the children were not at home for the two DVs, although they heard arguing, but "[e]verybody argues." Mother did not tell anybody that she and J.H. were arguing or that J.H. was drinking because she "didn't know [she] was supposed to tell [her] entire life story." She said J.H. "literally drank two beers every day" so she did not view it as a problem. She said J.H. did not try to physically harm the children and he had been approved by the agency to be around the children in a previous ongoing case.

22.

**GAL**

{¶ 65} James Ellis, the GAL, testified to the following. He came into the case between the adjudication and the disposition. He conducted an investigation and then authored a report. He observed visits at mother's apartment when the coach was there, he was at agency visits, he reviewed school records and all of the counseling records, he spoke with the counselors, with mother, with the foster parents about the children's behaviors, with people who were around the children, and he attended team meetings. Ellis' concerns regarding the children returning to mother's home were that "the three children are fundamentally disabled in the sense that they have behaviors that are not normal for children their age, and they have sexualized behaviors . . . that [mother] is -- is not capable of dealing with." He said that "all of the children need real attention to deal with their behaviors and try to adjust their behaviors, and [mother] does not have the capacity to even have one of the children and do that."

{¶ 66} He noted, with mother's testimony, when she was asked what the children needed, "it was all surface platitudes, nothing of substance about what that really meant to address the individual needs of the children, and, because of that, they need permanency in environments where they can get the attention that they need, and it's going to be a long, long time process . . ." The children did not

{¶ 67} need shallow level parenting, they need deep concerned, trained parenting. Ellis opined that "there's really no other option that's in [the three children's] best interest

23.

other than permanent custody where they can have family situations where they are getting the attention and . . . treatment they need."

{¶ 68} Other concerns that Ellis had were that mother was not honest about and did not disclose the two DVs, and the way mother responded to the second DV because there were contradictions - she wanted J.H. out of the house, but she would not agree to a no-contact order. Mother also tried to minimize the violence even though "the police report had hair pulling, hitting her in the head, choking her, and then [Ki.] talked about hiding in the closet because of the severity of the arguments they were having when these visits were happening . . ." Ellis was asked if it was normal for DV victims to minimize what happened, and he responded, "If they are unhealthy, I think it is normal." He said mother "never was able to productively address her trauma during this case because she continued with the same patterns that [he] assumed were partially based on the trauma she suffered during her life."

{¶ 69} Another concern was that, according to Ky., when a new man came into the house, mother would not discipline the children because her attention was elsewhere. Her need to have men in her life or have the approval of men caused her not to pay attention to what was going on with the children which created or helped create some of the children's problems, including their sexualized behaviors, like Ma. talking about sexual behaviors with J., and Ki. talking about sexual behaviors with J.

{¶ 70} With respect to visits, one of the first visits Ellis observed at the agency was pretty wild. He watched the visit on the monitor but could not keep the headphones

24.

on, because it was so loud. He took the headphones off and heard the visit happening down the hall. Visits got better, and it was apparent mother enjoyed the visits, she was trying and the children liked being with each other. However, even in the later visits, Ma. sat under the table screaming for half of the visit, or Ky. was mad, or the children were fighting, or J. was basically talking to herself, thinking that mother was listening. An issue Ellis had was that mother, who wanted her children back, did not have visits with the children at L.S.'s home despite the open-door policy, especially because L.S.'s home was more structured, and it was quiet. It would have been a good opportunity for mother to visit with Ki. and Ky. because neither boy did well with turmoil around. Although L.S. sometimes had a lot of kids at her house, it was always very orderly and calm. Ellis believed if mother "would have used the open-door policy and been able to go into an atmosphere that was not as chaotic she would have had the ability to use those tools [consistently, which she learned from the coach] without having the pressure of having all five kids in that visit where they're all hyped up and energized . . ."

{¶ 71} Ellis thought mother had a hard time trusting people and was not able to get past it, which was an ongoing issue since she also had a hard time asking for help with the children. Part of mother's pattern was she "clams up," which was not suitable for the children. Ellis did not think mother was capable of parenting any of the children, not even one child, as he worried that one child would be neglected and alone without a lot of attention when men came into the home. Ellis observed that none of the three children were of an age where they could be left alone.

25.

**{¶ 72}** In his report, Ellis recommended permanent custody of Ki., Ky. and Ma. to the agency, as he believed it was in their best interest. Moreover, after hearing the testimony of the witnesses, particularly mother's, it only reinforced Ellis' position because while mother loves her children and they love her, she is just not capable of dealing with the children, as their needs are so great.

### Permanent Custody Law

**{¶ 73}** The juvenile court may grant permanent custody of a child to a children services agency if the court finds, by clear and convincing evidence, two statutory prongs: (1) the existence of at least one of the factors set forth in R.C. 2151.414(B)(1)(a) through (e), and (2) the child's best interest is served by granting permanent custody to the agency. *In re M.B.*, 2005-Ohio-986, ¶ 6 (10th Dist.).

### First Prong

**{¶ 74}** Here, the agency moved for permanent custody under R.C. 2151.414(B)(1)(a), (b) and (d), which provisions state:

> [T]he court may grant permanent custody of a child to a movant if the court determines . . . by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody . . . to the agency . . . and that any of the following apply:
>
> (a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies . . . for [12] or more months of a consecutive [22]-month period ... and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
>
> (b) The child is abandoned.
> . . .

26.

(d) The child has been in the temporary custody of one or more public children services agencies . . . for [12] or more months of a consecutive [22]-month period [("12 of 22")].

{¶ 75} With respect to R.C. 2151.414(B)(1)(a), the elements necessary to satisfy a determination that the child cannot or should not be placed with either parent within a reasonable time are set forth in R.C. 2151.414(E). *See In re Schaefer*, 2006-Ohio-5513, ¶ 38. Here, the magistrate found that R.C. 2151.414(E)(1), (3), (4), (15) and (16) applied, which provisions state:

> (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. . .
> . . .
> (3) The parent . . . caused the child to suffer any neglect as described in section 2151.03 of the Revised Code . . .[4]
> (4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;
> . . .
> (15) The parent has . . . caused or allowed the child to suffer neglect as described in section 2151.03 of the Revised Code, and the court determines that the seriousness, nature, or likelihood of recurrence of the . . . neglect makes the child's placement with the child's parent a threat to the child's safety.
> (16) Any other factor the court considers relevant.

---

[4] R.C. 2151.03(A)(2) and (3) set forth provisions that a "'neglected child' includes any child: . . . [w]ho lacks adequate parental care because of the faults or habits of the child's parents, guardian, or custodian; [and] . . . [w]hose parents . . . neglects the child or refuses to provide proper or necessary . . . care . . . for the child's health, morals, or well being . . . ."

27.

**{¶ 76}** With respect to R.C. 2151.414(B)(1)(d), if a child has been in an agency's temporary custody for at least 12 of 22 months, the juvenile court need **not** find that the child cannot or should not be placed with either parent within a reasonable time, so it is unnecessary to apply the R.C. 2151.414(E) factors. *In re C.W.*, 2020-Ohio-1248, ¶ 56 (10th Dist.). Thus, the issue of whether a child cannot or should not be placed with either parent within a reasonable time, under R.C. 2151.414(B)(1)(a), is **only** relevant when a child has not been in the agency's custody for at least 12 of 22 months. *Id.* Subsections (a) and (d) of R.C. 2151.414(B)(1) are, therefore, mutually exclusive. *Id.*

**Second Prong**

**{¶ 77}** To satisfy the second prong, the agency must establish, by clear and convincing evidence, that permanent custody of the child to the agency is in the child's best interest. R.C. 2151.414(D)(1) states:

> In determining the best interest of a child at a hearing . . . the court shall consider all relevant factors, including, but not limited to, the following:
> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies . . . for [12 of 22 months] . . . ;
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
> (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

28.

**{¶ 78}** R.C. 2151.414(E)(7) to (11) factors are:

(7) The parent has been convicted of or pleaded guilty to [certain criminal offenses involving a child] . . .;
(8) The parent has repeatedly withheld medical treatment or food from the child . . .
(9) The parent has placed the child at substantial risk of harm two or more times due to alcohol or drug abuse and has rejected treatment two or more times. . .;
(10) The parent has abandoned the child.
(11) The parent has had parental rights involuntarily terminated with respect to a sibling of the child . . .

**{¶ 79}** Clear and convincing evidence requires proof which "produce[s] in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus. In order to determine whether a juvenile court based its judgment on clear and convincing evidence, the reviewing court examines the record to decide whether the trier of fact had sufficient evidence before it to satisfy the appropriate degree of proof. *State v. Schiebel*, 55 Ohio St.3d 71, 74 (1990).

**Magistrate's Decision/Judgment Entry**

**{¶ 80}** In the 19-page Magistrate's Decision, the magistrate made Findings of Fact and Conclusions of Law. The relevant Findings of Fact include:

32. Following [the second DV] . . . , it was learned that [J.H.] committed a similar offense a few weeks prior . . . and law enforcement was not summoned then either. The ongoing alcohol use, fighting and yelling were frequent and not reported by Mother. The children were present and heard the yelling; one child was reported to have hidden in the closet as a result. This was the same time period when the parenting coach was working with Mother. [J.H.] was planning to supervise the children when Mother would go to work - that was the plan for reunification.

29.

. . .

35. [Mother's] . . . lapse of good judgment, along with other testimony during this trial, indicates the needs of the children will not be met by the parents and should not be returned to Mother - she will not protect them and they are too young to protect themselves. Further, Mother is unlikely to meet the needs of the children by following through with the services that are necessary for the children.

36. During this on-going case Mother has failed to provide safe supervision for the children. The three children demonstrate sexualized behaviors to and against each other. Mother's testimony was that maybe it was a result of movies they watched when they took her phone from her bedroom at night while she was sleeping. There is no evidence that Mother will be able to handle this situation as the children must remain separated due to these behaviors.

37. The children were exposed to many things while living with Mother that result[ed] in the poor behavior of the children: lack of supervision; physical abuse concerns; inattention to the children; unsanitary home conditions; and multiple Agency investigations. The behaviors of the children are a result of the behaviors of the parents.

. . .

46. During Mother's supervised visits, by all accounts, the visits were chaotic. There was one visit in January 2025 that Mother showed she was trying to utilize what she has learned. This gave everyone involved hope. But at the next visit it was back to the normal chaos. Staff at the [agency] had to often intervene as the children were unruly and Mother was unable to get control. This is true despite the one-on-one, in home, direct and specific assistance provided to mother. During these visits, there is crying, yelling, a child under the table crying, screaming and running around the visitation room. The children will not listen to Mother; her attempts to provide direction and discipline are not effective; and her empty threats of discipline without follow through required staff to step in and take over control [and] discipline . . .

. . .

50. Mother has chosen the favor of men in her life over spending time with her children when the "open door" visitation policy was available for her.

30.

[J.H.] was physically abusive and controlling and recently she hid him living with her - also evidenced by [J.H.] moving his car to the nearby grocery store lot. Some of the children are aware that Mother has chosen the men over the children.

The Magistrate's Conclusions of Law are as follows:

1. That [Ki., Ky. and Ma.] have been in the Temporary Custody of the [agency] . . . for 12 or more months of a consecutive 22-month period of time, as of the filing of the motion[] for permanent custody. R.C. 2151.414(B)(1)(d).

2. That the [three] children herein cannot be appropriately placed with any of their parents within a reasonable amount of time, and further, that none of the children herein should be placed with any of their parents, as it would be contrary to the children's best interests. R.C. 2151.414(E).

3. That permanent commitment of the children in the custody of the [agency] is in the best interest of each individual child. R.C. 2151.414(D).

4. That a Judicial Determination has been made that the [agency] has made case planning and reasonable efforts to assist the parents but the parents have failed to remedy the conditions causing the removal and to make it possible for the children to return home. R.C. 2151.414(E)(1).

5. That the date of the original complaint was July 31, 2023 (emergency custody) and the filing date of the Motion for Permanent Custody was December 6, 2024. In between these dates, one parent committed at least two offenses of [DV] ([J.H.] against Mother); one offense was unreported and one was reluctantly reported and this caused the children to suffer neglect pursuant to R.C. 2151.03. R.C. 2151.414(E)(3).

6. That [Ky.'s father] and [J.H.] have not had contact with [Ki.][5] and [Ky.] . . . in excess of 90 days. R.C. 2151.414(E)(10) and R.C. 2151.414(D)(1)(e).

7. That the serious nature of the [DV] and the resulting neglect of the children make placement of the children with Mother a threat to the children's safety. R.C. 2151.414(E)(15).

---

[5] Presumably, the magistrate meant J.H. did not have contact with Ma.

31.

8. That other relevant factors include the multiple needs and behaviors of the children that require special services for the children in order to meet their needs and their ultimate need for permanency. The trial record is replete with opportunities Mother left untaken to use the skills and training that were invested in her. R.C. 2151.414(E)(16).

9. That the best interest factors R.C.2151.414(D)(1) and (2) have been considered and weighed by the Court wherein the relationships and interactions of the children with each other is chaotic; there was sexualized behaviors between them; the custodial history of the children for 570 consecutive days in the temporary custody of the Agency; three prior children services on-going cases; the continuous Agency involvement with the family since December 2019; and all other facts submitted on the record. Thus, evidence has established that the children need a legally secure permanent placement and that cannot be accomplished without granting the Motion for Permanent Custody. R.C. 2151.414.

10. That clear and convincing evidence has been established throughout the record in these proceedings that it is in the best interests of the children to grant permanent custody to the [agency].

11. That a Judicial Determination has been made that the [agency] has made Reasonable Efforts to establish a Permanency Plan for the Children, and that the Permanency Plan for the Children is placement in the Permanent Custody of the Agency, with a goal of finding an adoptive family for the children.

{¶ 81} The juvenile court reviewed and adopted the magistrate's decision as the judgment of the court.

**The Appeal**

{¶ 82} As previously noted, mother did not file objections to the magistrate's decision. Pursuant to Juv.R. 40(D)(4)(c), "[e]xcept for a claim of plain error, a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion . . . unless the party has objected to that finding or conclusion as required by Juv.R. 40(D)(3)(b)."

32.

{¶ 83} The plain error standard of review was set forth in *Goldfuss v. Davidson*, 79 Ohio St.3d 116 (1997), syllabus:

> In appeals of civil cases, the plain error doctrine is not favored and may be applied only in the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself.

{¶ 84} Based upon the foregoing law, by failing to file objections to the magistrate's decision, mother forfeited her right to challenge the juvenile court's adoption of the magistrate's factual findings or legal conclusions for any error other than plain error.

**First Assignment of Error**

{¶ 85} Mother argues the juvenile court's finding, pursuant to R.C. 2151.414(E)(1), that she failed continuously and repeatedly to substantially remedy the conditions which caused the children to be placed outside of the home, was not supported by clear and convincing evidence. Mother contends when the case opened in July 2023, the concern was for her parenting. She submits she engaged in case plan services, and under the tutelage of the coach, mother's visits moved from the agency to her home, and expanded to unsupervised, including overnight visits for the older children, and some of the children were then transitioning to mother's home. Unfortunately, the DV occurred in July 2024 between mother and J.H., and he was arrested but the charges were dropped. Yet, the agency terminated the coach and in-home visits, and mother was relegated to supervised visits at the agency.

33.

{¶ 86} Mother asserts the problem with her parenting occurred after the DV, which was not repeated, and which did not cause the initial removal. She contends while she arguably attempted to minimize the DV by not reporting it immediately or calling the agency, she involved a friend to protect herself, made a police report and prevented anything similar from happening again. Taken together, this court should find that she did not fail continuously and repeatedly to substantially address the issues which caused the children's initial removal.

{¶ 87} Upon review, as set forth above, the agency filed its motion for permanent custody alleging R.C. 2151.414(B)(1)(a), (b) and (d) applied, but the court's finding was based on R.C. 2151.414(B)(1)(d) - that the children had been in the agency's temporary custody for more than 12 of 22 months. Therefore, it was not necessary to apply the R.C. 2151.414(E) factors. Nevertheless, we do not find plain error in the juvenile court's adoption of the magistrate's findings and conclusions that there was clear and convincing evidence that mother failed to continuously and repeatedly substantially address the issues which caused the children's removal from her home. Accordingly, we find the first assignment of error not well-taken.

## Second Assignment of Error

{¶ 88} Mother argues the juvenile court's finding, pursuant to R.C. 2151.414(E)(3), that alleged neglect, as a result of the DV perpetrated by J.H. against her, in July 2024, was not supported by clear and convincing evidence as to her. She asserts this assignment of error does not apply to her, as the neglect apparently inferred is the

34.

lack of contact between J.H. and his daughter, Ma., from the time of the DV to the time of filing of the motion for permanent custody, in December 2024. Mother continued to visit with all of the children after the DV and participated in as many case plan services as allowed. Further, mother contends no evidence was presented that the children were even home for the DV. Mother argues the juvenile court's finding that one parent allowed the children to suffer neglect, between the date of the complaint and the date of motion for permanent custody, which did not involve her, was not supported by clear and convincing evidence as to her.

{¶ 89} Upon review, again, it was not necessary for the magistrate and juvenile court to apply the R.C. 2151.414(E) factors. Notwithstanding, we do not find plain error in the juvenile court's adoption of the magistrate's findings and conclusions that there was clear and convincing evidence that the two DVs, by J.H. against mother, as well as the alcohol use, fighting and yelling which were frequent and not reported by mother, occurred sometimes when the children were in the home and caused the children to suffer neglect, and that such neglect can be attributed to mother. Accordingly, we find the second assignment of error not well-taken.

### Third Assignment of Error

{¶ 90} Mother argues the juvenile court's finding, pursuant to R.C. 2151.414(E)(15), that the serious nature of the DV and the resulting neglect of the children makes their placement with mother a threat to the children's safety, was not supported by clear and convincing evidence.

35.

{¶ 91} In addition to the arguments made in her second assigned error, mother also contends that at the time of the DV, the children had already been out of the house for a year, so it was simply not possible for the children to lack adequate parental care as a result of that incident, because they were not in parental care to start with. Further, mother did not refuse to provide proper subsistence, education, medical or other necessary care because the children were not in her custody. Moreover, there was no evidence presented that the children were deprived of any necessary support as a result of the DV, or that they suffered any mental or emotional injury as a result of the DV.

{¶ 92} Upon review, as previously indicated, it was not necessary for the magistrate and juvenile court to apply the R.C. 2151.414(E) factors. Nonetheless, we do not find plain error in the juvenile court's adoption of the magistrate's findings and conclusions that there was clear and convincing evidence presented that the serious nature of the DVs, by J.H. against mother, and the resulting neglect of the three children by mother made the children's placement with mother a threat to their safety. Accordingly, we find the third assignment of error not well-taken.

## Fourth Assignment of Error

{¶ 93} Mother argues the juvenile court's finding, pursuant to R.C. 2151.414(E)(16) (any other relevant factor), that she failed to utilize opportunities to use the skills and training that were invested in her to address the children's many needs and behaviors that required special services, was not supported by clear and convincing evidence.

36.

{¶ 94} In addition, to the arguments previously made, mother asserts, with respect to the children's aggressive and sexualized behavior, there was no testimony as to the source or therapeutic treatment offered to the children to address those behaviors. Mother contends that it was undisputed that the children exhibited problematic behaviors, but there was little testimony as to what the possible causes of the behaviors were and there was no testimony as to what sexual behavior the children had been exposed to, or by whom, which might have caused them. She also argues it appears that the juvenile court was "piling on" mother and effectively blaming her for the children's behaviors and mental health issues, without specifying exactly what she did to cause or create the issues of aggression and sexualized behaviors.

{¶ 95} Upon review, while it was unnecessary for the magistrate and juvenile court to apply the R.C. 2151.414(E) factors, we do not find plain error in the juvenile court's adoption of the magistrate's findings and conclusions that there was clear and convincing evidence presented that mother failed to take advantage of the opportunities to use the skills and training with which she was provided to address her children's needs and behaviors, as the testimony of L.S. and the GAL clearly support these findings and conclusions. Accordingly, we find the fourth assignment of error not well-taken.

## Fifth Assignment of Error

{¶ 96} Mother argues the juvenile court's finding, pursuant to R.C. 2151.414(E), that none of the three children can be placed with any of the parents within a reasonable

amount of time, and that none of them should be placed with any of the parents, was not supported by clear and convincing evidence.

{¶ 97} Mother asserts this finding is a catch-all restatement of the other findings and is lacking in specificity as to why the children cannot be placed with any parent within a reasonable amount of time, particularly because there was effectively no testimony as to where either Ki. or Ma. are placed, or how they are doing, but there was testimony that Ki. never stopped expressing his interest to move back in with mother. With Ky., mother notes there was testimony that his relative expressed an interest in legal custody, but since Ky. just moved to Utah the week before the hearing, there was no testimony as to how that placement was working.

{¶ 98} Mother again observes that the children exhibited concerning behaviors, but there was no testimony as to how those behaviors were related to parenting, or to which parent. She contends there was no specific testimony or evidence as to why none of the children can be placed with any of the parents.

{¶ 99} Upon review, once again, it was not necessary for the magistrate and juvenile court to apply the R.C. 2151.414(E) factors. Yet, we do not find plain error in the juvenile court's adoption of the magistrate's findings and conclusions that there was clear and convincing evidence presented that none of the children could be placed with any of the parents within a reasonable amount of time, and that none of them should be placed with any of the parents, given the many needs and behaviors of the children. Accordingly, we find the fifth assignment of error not well-taken.

38.

**{¶ 100}** We note that mother did not present any arguments with respect to the children's best interest, but we find that the record shows the magistrate and juvenile court considered the relevant best interest factors, and clear and convincing evidence in the record supports the conclusion that granting permanent custody of the three children to the agency serves their best interest.

**{¶ 101}** On consideration whereof, the judgment of the Sandusky County Court of Common Pleas, Juvenile Division, is affirmed. Mother is ordered to pay the court costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.

_____
JUDGE

Myron C. Duhart, J.

_____
Charles E. Sulek, P.J.                                           JUDGE
CONCUR.

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.